IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Nick A. Santino,

      Plaintiff,

      v.                         Case No. 2:10-cv-184

Columbus Public Schools,

      Defendant.


<u>OPINION AND ORDER</u>

This is an employment discrimination action under 42 U.S.C. §1983 brought by plaintiff Nick A. Santino against his former employer, defendant Columbus Public Schools. Plaintiff, a naturalized United States citizen of Iranian origin, was employed by defendant as a school bus driver. Plaintiff alleges that during his employment with defendant, he was subjected to hostile comments by his co-workers based on his national origin. He further alleges that he was disparately treated and retaliated against in violation of his equal protection rights.

This matter is before the court on the defendant's motion for summary judgment.[1] The procedure for granting summary judgment is found in Fed. R. Civ. P. 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The evidence must be viewed in the light most favorable to the

---

[1] Defendant has moved to strike plaintiff's sur-reply (Doc. No. 52) which was filed without leave of court. S.D. Ohio Local Rule 7.2(a)(2). The motion (Doc. No. 53) is denied.

nonmoving party. <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144 (1970). Summary judgment will not lie if the dispute about a material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). However, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). <u>See</u> <u>also</u> <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574 (1986).

The Sixth Circuit Court of Appeals has recognized that <u>Liberty Lobby</u>, <u>Celotex</u> and <u>Matsushita</u> effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. <u>Street v. J. C. Bradford & Co.</u>, 886 F.2d 1472, 1476 (6th Cir. 1989). The court in <u>Street</u> identified a number of important principles applicable in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. <u>Id</u>. at 1479. In addition, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" <u>Id</u>. (quoting <u>Liberty Lobby</u>, 477 U.S. at 257). The nonmoving party must adduce more than a scintilla of evidence to overcome the summary judgment motion. <u>Id</u>. It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'" <u>Id</u>. (quoting <u>Matsushita</u>, 475 U.S. at 586). Moreover, "[t]he trial

2

court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." Id. That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.

## I. Background

Plaintiff began his employment with defendant in September of 2004. Defendant's Ex. 1. In a letter dated March 25, 2006, plaintiff informed Greg McCandless, his supervisor at the Morse Road school bus compound, that on Friday, March 25, 2006, Monique Myles, a co-worker, scolded plaintiff for driving too fast on Morse Road, and Diane Ledsome, another co-worker, said, "yes you better watch out or we do not care and we tell you where you go and some other S.O.B." Defendant's Ex. 23. Plaintiff claimed that in the past, one of these ladies told him that he looked like a Somalian gangster, and that the "other lady" told him that he could not wash his bus until she permitted him to do so, since she had to wash several other buses. Plaintiff testified in his deposition that when he discussed the matter with McCandless and his immediate supervisor, Martha Moore, McCandless asked plaintiff what he had done to them to have them talking like that. Santino Dep., p. 65. However, Moore stated, "That's not right." Moore called three women over and talked with them. Santino Dep., p. 66.

A year later, in a letter dated April 28, 2007, plaintiff reported to McCandless that he had heard a few co-workers calling him a terrorist and "other names." he claimed that he was experiencing "so much stress" and that he was "uneasy about the whole unwanted accusation[.]" Defendant's Ex. 23. Plaintiff

testified that when he informed Moore about his complaint, she stated, "That's ridiculous, I know I talked to them," and she told him to report the incidents to McCandless. Santino Dep. p. 67. Plaintiff claimed that McCandless just asked plaintiff what he had done to the co-workers to provoke these statements.

Plaintiff gave another letter to McCandless and Moore on May 9, 2007, stating that some co-workers had been "calling names and making my like very stressful[.]" Defendant's Ex. 23. Plaintiff alleged that Monica Myles and another co-worker named Tina got money from other drivers to wash their buses, and that when he tried to wash his own bus, they yelled at him aggressively and almost hit him and called him a foreigner. They stated that he could not wash his bus until they were done with the other buses. Moore told plaintiff that Myles had no right to say that, and further stated that since Myles was getting money to wash buses, she could wait until after plaintiff and the other drivers washed their buses. Santino Dep. pp. 71-72. Moore said she would talk with the women. Santino Dep. p. 73.

A year later, plaintiff addressed another letter to McCandless dated May 2, 2008. Defendant's Ex. 23. Plaintiff complained about "receiving harassment from co-workers" and stated that he did not believe that anyone "should take any insults[.]" Plaintiff further stated that "if they think I am a foreigner and other thing they know better I am much civilize [sic] than those individuals[.]" Plaintiff spoke with McCandless and indicated that the problems were being caused by the same three women. Santino Dep. p. 73-74. Plaintiff then gave a letter dated May 12, 2008, to McCandless and Moore, stating that the co-workers were still calling him "terrorist, gangster and other SOBs." Plaintiff stated

4

that "in few occasions I have heard them giving remarks and made [sic] accusations such as 'He got bomb in the bus for suicide purposes.'"  Plaintiff stated in the letter that the harassment made him "very stressful and uneasy."  Plaintiff testified that Moore shook her head and stated "I talked to these people, I don't know what's going on here[.]"  Santino Dep. p. 77.  According to plaintiff, McCandless stated, "[W]ell, you want me to send you downtown (presumably a reference to someone in higher authority), you guys" and plaintiff responded, "If you have to, you have to." Santino Dep. p. 76.

Plaintiff also kept a journal during this period.  The entry for March 22, 2007, states that Brian McCauley, a co-worker, informed plaintiff that he heard "a few people" calling plaintiff a terrorist.  One person said that plaintiff was going the wrong way (in his bus) because he was carrying a bomb to blow something up or make a suicide attack.  Defendant's Ex. 24.  An entry on March 27, 2007, stated that a lady in the garage (plaintiff did not know her name) asked him where he was from.  Plaintiff told her he was from the U.S.A., and she replied that he was a terrorist. Plaintiff noted on April 3, 2007, that Martha Moore called him into her office and stated, "I am going to talk to those [people] calling you [a] terrorist and other thing[s] ... like [foreigner]." On March 6, 2008, plaintiff had a discussion with an employee named Jay about the bus route, and Jay told him that some people in the office were calling plaintiff a terrorist, and he asked, "What's the problem?"

Some of the entries are not clear and do not specifically refer to acts of harassment based on national origin, but rather to generic quarrels or slights.  For example, plaintiff noted on May

5

3, 2007, that he went into McCandless's office and extended his hand to shake McCandless's hand, but McCandless ignored the gesture and said something about plaintiff having to record his license plate number with places on his assigned routes for security purposes. On September 5, 2007, a union person asked plaintiff, "Did you drive your car to this side of [the] building?" When plaintiff said, "No," the person replied that he needed to change his glasses. Plaintiff wrote that this "was kind of strange." On September 12, 2007, plaintiff noted that he was walking from his bus to the office at 5:20 p.m., when he heard a male voice from between the buses loudly say, "You go home." No facts were recorded to indicate that this person was talking to plaintiff, or that the statement meant anything other than to say that it was the end of the work day and time to go home.

On September 19, 2007, plaintiff noted in his journal that he was telling Mike, a mechanic at the garage, that the fan didn't work, when another mechanic plaintiff referred to as "Robin" asked him if he had a problem with the bus. When plaintiff said, "Yes," Robin said "fuck you." Mike then fixed the fan. Plaintiff wrote that the previous year, as plaintiff was writing up a mechanical problem on the bus, Robin raised his crow bar, then stated that he was just kidding around. Plaintiff reported this to McCandless, and McCandless said he would talk to this person and tell him not to joke around.

On November 30, 2007, plaintiff recorded an incident with an employee he referred to as Robert, who pounded on plaintiff's bus door and said, "Do not fuck with me." Plaintiff reported this incident to McCandless, who called both men into his office. According to plaintiff's note, Robert denied saying anything to

6

plaintiff, and denied knowing plaintiff, and plaintiff apologized to him.  Plaintiff's theory was that Monica and the other woman had made friends with Bob, who had a short temper, with the goal of encouraging him to get into a fight with plaintiff so that plaintiff would be fired.  Santino Dep. p. 81.

On September 4, 2008, plaintiff filed an application for leave from his employment with defendant for the period from September 4, 2008, until September 25, 2008.  The form was accompanied by a letter from plaintiff's physician, Dr. Terry Slayman, which stated that the "patient's absence is physician advised due to illness or injury."  Defendant's Ex. 2.  Dr. Slayman, testifying from his office records, stated that plaintiff came to his office on September 3, 2008, complaining of fatigue, insomnia, and dizziness.  Slayman Dep. Ex. 26.  Plaintiff stated that he drove a school bus, that he had a "little stress," and that he did not feel he could function as a bus driver.  Dr. Slayman is a general practitioner, not a psychiatrist or psychologist.  Slayman Dep. pp. 10-11.  Based on plaintiff's statements, Dr. Slayman felt he should not be driving a school bus, and he recommended that plaintiff stay off work until September 25th.  Slayman Dep. pp. 15-16.  Dr. Slayman conducted no tests, but based on his diagnosis of insomnia and fatigue, he prescribed Trazodone to aid plaintiff's insomnia.  Slayman Dep. pp. 13, 17.  Plaintiff's request for leave was granted by a letter dated September 10, 2008, signed by Director Mira Wright, Human Resources Administration.

While on leave, plaintiff applied for a position with The Ohio State University as a bus driver.  He was hired effective September 14, 2008.  Defendant's Exs. 3, 5.  He completed an application in which he noted his employment with the Columbus Public Schools and

indicated September of 2008 as the ending date of that employment. Defendant's Ex. 4.  By letter dated September 12, 2008, plaintiff advised defendant that he was resigning from his position with the Columbus Public Schools.  Defendant's Ex. 6.  Plaintiff stated in the letter, "It was my pleasure being a part of the team at Columbus City Schools.  I truly enjoyed working with all of my co-employees[.]"  By letter dated September 22, 2008, plaintiff rescinded his resignation and stated that he would return to his bus driver position when his physician permitted him to return to work.

On September 22, 2008, plaintiff telephoned Dr. Slayman's office to state that he wanted to extend his leave from work. Slayman Dep. Ex. 27.  Because Dr. Slayman was out of the office on September 24, 2008, plaintiff was seen by Linda Ambrose, a nurse practitioner.  Slayman Dep. Ex. 28.  Plaintiff complained about high stress, appetite change, feeling overwhelmed and worrying.  He stated that he was not able to work because he was very depressed and distracted, and that he wanted to try some medication and counseling.  Dr. Slayman's records indicated that plaintiff said that he had lost a girlfriend.  When asked what he meant by this at his deposition, plaintiff stated that he did not recall.  Santino Dep. p. 96.  Nurse Ambrose gave plaintiff a prescription for an anti-depressant based on her diagnosis of depression with anxiety, and stated that plaintiff would be referred for psychological therapy.  Plaintiff testified at his deposition that he was provided with the names of some psychologists, but that he never went to see a psychologist.  Santino Dep. p. 97.  Nurse Ambrose gave plaintiff a letter extending his leave from work until November 28, 2008.  This leave was approved by Director Wright.

8

Defendant's Ex. 8.

Plaintiff worked at Ohio State from September 15, 2008, to October 10, 2008.  He took sick leave from October 13, 2008, to October 15, 2008, sick leave and vacation time on October 16, 2008, and vacation time and leave without pay until November 28, 2008.  Defendant's Exs. 7, 9.  By letter dated December 2, 2008, plaintiff was advised by Director Wright that he had been approved for medial leave with pay through November 7, 2008, and medical leave without pay through November 28, 2008, with an estimated return to work date of December 1, 2008.  Defendant's Ex. 10.  That leave was later extended to permit plaintiff to return to duty on December 17, 2008.  Defendant's Ex. 11.

Plaintiff worked again at Ohio State from December 1, 2008, through December 15, 2008.  On December 16, 2008, plaintiff filed an application for leave from his job at Ohio State, requesting leave from December 16, 2008, through January 7, 2009, citing the death of his aunt as the reason.  However, this request was disapproved on January 12, 2009.  Defendant's Ex. 12.

On December 1, 2008, plaintiff saw Nurse Ambrose for cough, low grade fever, and ear pain.  Slayman Dep. Ex. 30.  Plaintiff denied feeling stressed or having sleep disturbances, and stated that he was feeling much better and ready to go back to work.  Nurse Ambrose prescribed an antibiotic.  Dr. Slayman saw plaintiff on December 8, 2008, for a cough, and he prescribed another antibiotic.  Slayman Dep. Ex. 31.  Plaintiff made no mention of depression or anxiety during this visit.  Slayman Dep. p. 32.  Plaintiff was given a letter which excused him from work from November 28, 2008, through December 16, 2008, with a return date of December 17, 2008, with no restrictions specified.

Plaintiff returned to work at his job with the defendant on December 17, 2008, and worked December 17th through December 19th, which was followed by the school system's two-week winter break. By request dated December 19, 2008, plaintiff requested another leave of absence from the Columbus Public Schools job from January 5, 2009, through January 8, 2009, for the death of his aunt. Defendant's Ex. 13.  By letter dated January 9, 2009, plaintiff again sent a resignation letter to the defendant, stating that he was "writing this letter with a deep pain, because in working with Columbus Schools, I found there are truly plenty of great people with lots of common-sense, compassion in which you can count on." Plaintiff stated that he was forced to resign because he needed full-time employment.  Defendant's Ex. 14.

On January 9, 2009, a request was made by Human Resources staff at Ohio State for plaintiff's removal for neglect of duty and dishonesty.  Defendant's Ex. 15.  Plaintiff had not completed his period of probation.  This request noted that plaintiff was on leave from December 15, 2008, to January 7, 2009.  Plaintiff called on December 15, 2008, and left a message that he would not be to work on December 16th, and to put his employment on "hold."  On December 18, 2008, management received a faxed letter from plaintiff stating that he had to leave the country for a family emergency, and that he would not be returning to work until January 8, 2009.  On December 22, 2008, management received a phone message from plaintiff stating that he was in Chicago on his way home, and that he would see them when he returned.  The removal request further stated that the staff at Ohio State had been unaware that plaintiff was still working for the Columbus Public Schools until they were recently notified of this fact by the defendant's Labor

Relations Office.  Ohio State was informed that plaintiff had worked for defendant on December 17, 18 and 19, during a time period when he was scheduled to work at Ohio State, and for which he had requested time off work for a family emergency.  By letter dated January 14, 2009, plaintiff's employment with Ohio State was terminated effective January 17, 2009.

Now without a job at Ohio State, plaintiff sent a letter to defendant dated January 16, 2009, rescinding his resignation letter of January 9, 2009.  Defendant's Ex. 16.  Plaintiff explained that although "I love working with Columbus City Schools, people I serve and work [with]," he left because he had four children and wanted them to be able to attend the university with a tuition reduction (although his children are all adults in their twenties).  He apologized for any inconvenience he may have caused, stating that it was "difficult to leave City Schools" and that, while faced with the death of his aunt and other family issues, he "was struggling how to do the right thing[.]"  He stated that he was ready to return to his driving job that day.  The defendant's records indicate that plaintiff was AWOL from his job on January 12th through January 15th, and that he returned to work with the Columbus School District on January 20th.  Defendant's Ex. 17.

Dr. Slayman saw plaintiff again on February 18, 2009, for an ear infection.  Slayman Dep. Ex. 34.  Plaintiff did not mention depression or anxiety at this visit.  Slayman Dep. p. 36.  Dr. Slayman's records contained no complaints from plaintiff concerning harassment at work.  Slayman Dep. p. 38.  Dr. Slayman testified that he was not aware that plaintiff was driving a bus for Ohio State, and that if plaintiff had told him that he was going to be working at Ohio State, he would not have given him an excuse.

11

Slayman Dep. p. 46.

In a journal note dated March 3, 2009, and in his deposition, plaintiff discussed a conversation with his supervisor, Debra Webber.  Plaintiff told Webber that he needed extra work, and she refused to give him extra assignments.  She told him not to push the issue, because she knew he had been working at Ohio State. Santino Dep. p. 88.  Plaintiff stated that he called and talked with Mary (last name unknown), Webber's supervisor who schedules field trips.  Mary called Webber about plaintiff's request. According to plaintiff, Webber then told him that she was going to give him three extra assignments, but that she was going to have to report the fact that he had been working at Ohio State while he was on sick leave.

By notice dated March 5, plaintiff was advised about a hearing concerning plaintiff's alleged neglect of duty, nonfeasance, AWOL status, and dishonesty.  Defendant's Ex. 18.  A hearing was held before Hearing Officer Jerry McAfee on March 16, 2009.  The charges were that plaintiff failed to comply with regulations concerning the documentation of his medical leave of absence from September 4, 2008, through November 28, 2008; that he violated Article 15.2 (Sick Leave) and Article 15.3 (Leaves of Absence) of the Collective Bargaining Agreement by filing a willful false statement that he was unable to work, but then worked at Ohio State while on medical leave; that he violated Article 16.1(1), by using personal leave to engage in other gainful employment; and that he was absent from duty without prior approval by failing to report and call off work from January 9, 2009, through January 15, 2009.  Defendant's Ex. 19.  At the hearing, plaintiff was represented by B.J. Simmons-Talley, President of the Columbus School Employees Association.

12

Evidence was presented by plaintiff, including letters from parents in support of plaintiff and a letter dated December 22, 2008, from the Executive Director of Human Resources congratulating plaintiff on his perfect attendance for the 2007-2008 school year. Plaintiff also submitted a written statement of his position, in which he claimed that he did call in to work on January 9th and spoke with Taven Jones, informing him that he would not be at work until January 20th. He stated that he was under stress because he had been "abused in the work place" and "called Mafia and terrorist with co-workers in the past." He admitted that he worked at Ohio State while he was on sick leave, but contended that he left because he was in a stressful condition. He then stated that he "came to [the] understanding that Columbus Schools are the better place to work[.]" The hearing officer sustained the charges, and plaintiff's employment was terminated effective March 16, 2009. A personnel action form dated March 18, 2009, stated that plaintiff's employment was terminated effective March 16, 2009, and that plaintiff was not eligible for rehire by the defendant. Defendant's Exhibit 21.

Plaintiff filed an appeal from his termination with the Columbus Civil Service Commission. In this appeal, plaintiff was represented by Ohio Association of School Employees Staff Attorney Matthew Banal. A settlement of the appeal was negotiated. Under the terms of the settlement, defendant agreed to change plaintiff's personnel action from "Termination" to "Resignation" and to provide a neutral reference to prospective employers inquiring about plaintiff's employment with the district. Plaintiff signed a resignation letter dated May 28, 2009, resigning his position effective March 16, 2009. Defendant's Ex. 22.

13

In support of its motion for summary judgment, defendant has submitted the numerous exhibits referred to above.[2]  Defendant also submitted the report from Dr. Jeffrey L. Smalldon, Ph.D., a psychologist, of his evaluation of plaintiff in February and March of this year.  Defendant's Ex. E.  Dr. Smalldon noted the "strongly paranoid flavor of [plaintiff's] personality style/orientation" and observed that plaintiff was "highly suspicious of other people's motives; strongly inclined to project blame onto others for the things that go awry in his life; prone to overgeneralizing from the things that he experiences; and hypersensitive to slights, both real and perceived."  Ex. E, pp. 19-20.  Dr. Smalldon further stated that "there is, in my opinion, no reason to believe that *whatever might have occurred* during the time of his employment as a bus driver for the Columbus City Schools resulted in any lasting psychological or emotional conditions."  Ex. E., p. 20.

Plaintiff has submitted an affidavit from Buick Moomchi, Ph.D., a psychologist.  Dr. Moomchi is plaintiff's brother and resides in Albuquerque, New Mexico.  Plaintiff's Ex. 9.  Dr. Moomchi did not professionally consult with plaintiff due to ethical considerations.  He stated in his affidavit that around the time of plaintiff's written communications with his supervisors, plaintiff informed him that some of his fellow employees were harassing him about his national origin and calling him a "terrorist."  Dr. Moomchi stated that plaintiff seemed "very disturbed" by the offensive comments, as well as anxious and

---

[2]Defendant has also submitted documents relating to other legal actions plaintiff has filed in the past against other employers in an effort to portray plaintiff as a vexatious litigator unworthy of credence.  Defendant has also submitted other allegedly false employment applications made by plaintiff.  However, in these summary judgment proceedings, plaintiff's credibility is not at issue.

14

depressed.

Plaintiff has also submitted an affidavit from Essy Sohaili, who stated that plaintiff discussed his problems in the workplace on several occasions, including his co-workers' accusations that he was a gangster and terrorist. Plaintiff's Ex. 10. He stated that plaintiff was disturbed about the way he was being treated at work, and that this conduct caused plaintiff a lot of stress. In addition, plaintiff has filed the affidavit of Brian McCauley, who was employed at the Morse Road Compound while plaintiff worked there. Plaintiff's Ex. 11. McCauley stated that from 2005 through 2007, on "several occasions," he heard "some Columbus Public School employees" make remarks about plaintiff, such as "he is a terrorist, he has a bomb in the bus and going to explode the bus with the kids in it."

In his affidavit attached to the memorandum contra defendant's motion, plaintiff states that he was "teased for being Persian, by calling me a terrorist." He also alleges for the first time that he was suspended from his job "for tensions that arose because I complained about the hurtful comments being made." He further states that the "hurtful comments made it difficult for me to work, it caused me [to] seek sick leave and to find other [sic] job." In a second affidavit attached to his sur-reply, plaintiff stated that he worked elsewhere while on sick leave with the hope of getting away from the hostile work environment. He also reiterates his allegations that Webber falsely accused him of being AWOL and retaliated against him for calling Mary about getting extra work assignments.

Plaintiff has also filed a sur-reply to which he attaches a letter from Metamorphosis Counseling and Consulting LLC dated June

15

14, 2011, concerning the mental health assessment of plaintiff made by Darren Peterson, M.A.  The report does not indicate that any testing was done or that any records were reviewed.  The examiner's diagnosis, based solely on plaintiff's reports that he suffered from continuing depression and anxiety as a result of the effects of harassment while employed with defendant, was that plaintiff was suffering from depressive disorder, generalized anxiety disorder, and post traumatic stress disorder.[3]

## II. Analysis

A. Effect of settlement

Defendant first argues that plaintiff's claims are barred by the settlement of his appeal before the Columbus Civil Service Commission.  Defendant notes that under the terms of the Collective Bargaining Agreement between the Columbus School Employees Association and the Columbus Board of Education, Defendant's Ex. D, the "failure of the grievant to appeal any decision to the next step within the time set forth for such appeal shall constitute a waiver of the right of further appeal in all cases ... and a final disposition of the grievance shall be made on the basis of the last decision given so far as the Board of Education grievance steps are applied."  This provision may preclude plaintiff from relitigating the alleged violations presented to the hearing officer.  However, the record does not reveal that plaintiff's discrimination claims were included within the grievance.  Unlike the cases cited by defendant, which involved the settlement of a claim of

---

[3]Because this report was filed long after the February 28, 2011, deadline for disclosure of expert witnesses, see Doc. No. 36, it is not properly before the court in these summary judgment proceedings.  However, the court has reviewed the report, and nothing in it would change the court's ruling on the motion.

discrimination before the Ohio Civil Rights Commission and/or a settlement agreement containing an express waiver of Title VII or other discrimination claims or the right to bring an action for discrimination, the settlement agreement in this case simply resolved the matter of plaintiff's termination on the grounds of the violations alleged against him.  Since the current record fails to show that plaintiff affirmatively waived his right to bring an action for discrimination, this court cannot say that plaintiff's discrimination claims are waived.

B. Title VII

Defendant argues that plaintiff's claims cannot be founded on Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e), et seq., because plaintiff failed to file a complaint with the Equal Employment Opportunity Commission.  Defendant is correct.  As a prerequisite to bringing suit under Title VII, a claimant must exhaust his administrative remedies.  Weigel v. Baptist Hosp. of E. Tenn., 302 F.3d 367, 379 (6th Cir. 2002).  A claimant must: (1) timely file a charge of employment discrimination with the EEOC; and (2) receive and act upon the EEOC's statutory notice of the right to sue.  Puckett v. Tennessee Eastman Co., 889 F.2d 1481, 1486 (6th Cir. 1989).  Plaintiff does not contend that he filed a charge of discrimination with the EEOC, and he states that his claims are brought pursuant to §1983.  Therefore, this court will analyze his claims under §1983.  However, the court notes that Title VII standards are applied to employment actions under §1983. See Risinger v. Ohio Bureau of Workers' Compensation, 883 F.2d 475, 483 (6th Cir. 1989)(Title VII standards apply to equal protection hostile work environment claim under §1983); Gutzwiller v. Fenik,

17

860 F.2d 1317, 1325 (6th Cir. 1988)(showing plaintiff must make to recover on a disparate treatment claim under Title VII mirrors that which must be made to recover on an equal protection disparate treatment claim under §1983).

C. Statute of Limitations

The statute of limitations for an action under §1983 filed in Ohio is the two-year statute of limitations under Ohio Rev. Code §2305.10. <u>Bishop v. Children's Center for Developmental Enrichment</u>, 618 F.3d 533, 536 (6th Cir. 2010). Plaintiff submitted his <u>pro</u> <u>se</u> complaint to the clerk's office for filing on March 1, 2010, and the complaint was filed on the docket on March 10, 2010. Thus, the limitations period would extend back to March 1, 2008. Defendant argues that recovery for any events which occurred prior to that date would be barred by the statute of limitations.

Typically, the limitations period starts to run when the plaintiff knows or has reason to know of the injury which is the basis of his action. <u>Kuhnle Bros., Inc. v. County of Geauga</u>, 103 F.3d 516, 520 (6th Cir. 1997). An exception to that rule is where the plaintiff can show prior discriminatory activity that continues into the present, as opposed to prior discriminatory activity with effects which continue into the present. <u>Bell v. Ohio State University</u>, 351 F.3d 240, 247 (6th Cir. 2003). The Supreme Court held in <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101 (2002) that although the continuing violation doctrine does not permit recovery for discrete acts of discrimination that occurred outside the statutory period, it does apply in hostile work environment actions under Title VII. <u>Id.</u> at 113. The Sixth Circuit has applied this reasoning to claims brought under §1983. <u>See</u> <u>Sharpe</u>

18

v. Cureton, 319 F.3d 259, 267 (6th Cir. 2003).

In this case, any claim of retaliation or disparate treatment stemming from plaintiff's termination in March of 2009, a discrete act, arose within the limitations period.  Insofar as defendant argues that plaintiff's letter complaints to his superiors before March 1, 2008, are barred and cannot be considered, that argument is not well taken.  Because plaintiff also complained of harassment in letters to his supervisors in May of 2008, within the limitations period, his hostile work environment claim falls within the continuing violation exception.

D. Disparate treatment claim.

To state a claim under §1983, plaintiff must allege a violation of a right secured by the Constitution or laws of the United States and must show that the deprivation of that right was committed by a person acting under color of state law.  Harbin-Bey v. Rutter, 420 F.3d 571, 575 (6th Cir. 2005).  The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution prohibits discrimination by government which intentionally treats one differently than other similarly situated without any rational basis for the difference.  Johnson v. Bredesen, 624 F.3d 742, 746 (6th Cir. 2010); Radvansky v. City of Olmsted Falls, 395 F.3d 291, 312 (6th Cir. 2005).  To the extent that plaintiff's complaint may be read to assert that his national origin was the real motivation for the termination of his employment, the framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), applicable to Title VII cases, also applies to plaintiff's equal protection disparate treatment claim under §1983.  Arendale v. City of Memphis, 519 F.3d 587, 603 (6th

Cir. 2008).

To prove a discrimination claim under §1983, plaintiff must establish by a preponderance of the evidence that he was the victim of intentional or purposeful discrimination. Gutzwiller, 860 F.2d at 1325. In order to establish a prima facie case of national origin discrimination, a plaintiff must proffer either direct or circumstantial evidence of discrimination. Abdulnour v. Campbell Soup Supply Co., LLC, 502 F.3d 496, 501 (6th Cir. 2007). In the absence of direct evidence of discrimination, a plaintiff must set forth a prima facie case of discrimination by demonstrating: (1) he is a member of a protected class; (2) he was qualified for the job; (3) he suffered an adverse employment decision; and (4) he was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees. Arendale, 519 F.3d at 603. If plaintiff establishes a prima facie case, then the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for plaintiff's termination. Abdulnour, 502 F.3d at 501-02. If defendant does so, then the burden shifts back to plaintiff to prove by a preponderance of the evidence that the legitimate reasons offered by defendant were not the true reasons, but were a pretext for discrimination. Id. at 502. Plaintiff may establish that defendant's proffered reason is mere pretext by establishing that it: (1) has no basis in fact; (2) did not actually motivate plaintiff's termination; or (3) was insufficient to warrant plaintiff's termination. Id.

In this case, there is no direct evidence of discriminatory intent by the person or persons who decided to terminate plaintiff's employment. There is also no evidence that plaintiff was replaced by a person outside the protected class, or that he

was treated differently than persons not of Iranian origin who had committed similar violations.  However, even assuming that a prima facie case has been shown, defendant has presented evidence of legitimate, non-discriminatory reasons for plaintiff's termination. Although plaintiff denied the AWOL violation at his hearing, claiming that he called and told Taven Jones that he would not be at work, there is no evidence that plaintiff obtained prior approval for his absence.  Plaintiff admitted that he worked for Ohio State while he was on sick leave from his job with defendant. No trier of fact could reasonably find that plaintiff's termination was motivated by his national origin, and defendant is entitled to summary judgment on this claim.

E. Retaliation

To establish an unconstitutional retaliation claim under §1983, plaintiff has the burden to prove: (1) that there was constitutionally-protected conduct; (2) an adverse action by defendant sufficient to deter a person of ordinary firmness from continuing to engage in that conduct; and (3) a causal connection between the first and second elements, that is, the adverse action was motivated at least in part by plaintiff's protected conduct. Eckerman v. Tennessee Dep't of Safety, 636 F.3d 202, 207 (6th Cir. 2010).  A plaintiff successfully demonstrates a causal connection between the adverse action and the protected conduct by offering direct or circumstantial evidence indicating that the protected conduct was a substantial or motivating factor behind the adverse action against him. Id. at 208.  If plaintiff meets his burden of establishing a prima facie case of retaliation, then the burden shifts to defendant to prove by a preponderance of the evidence

that the employment decision would have been the same absent the protected conduct.  Id.  Summary judgment is warranted if, in light of the evidence viewed in the light most favorable to plaintiff, no reasonable juror could fail to return a verdict for the defendant. Id.

Plaintiff mentions the word "retaliation" at the end of his complaint.  The only factual allegations in the complaint which suggest a retaliation claim are the allegations that Debra Webber, plaintiff's supervisor, reported the fact that he had worked at Ohio State while on sick leave after plaintiff called Mary and went over Webber's head to secure extra work.

To establish a constitutional violation in this context, plaintiff, as a public employee, had to demonstrate that his speech (asking for extra work) was constitutionally protected and that the speech was a substantial or motivating factor in the termination. Jackson v. Leighton, 168 F.3d 903, 909 (6th Cir. 1999)(citing Board of County Comm'rs, Wabaunsee County, Kan. v. Umbehr, 518 U.S. 668, 675 (1996)).  Plaintiff must show that his speech related to a matter of public concern, and his interest in expressing himself must not be outweighed by any injury the speech could cause to the interest of the defendant as an employer.  Waters v. Churchill, 511 U.S. 661, 668 (1994).  Federal courts normally do not review personnel decisions reacting to an employee's behavior when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters of only personal interest.  Jackson, 168 F.3d at 909 (citing Connick v. Myers, 461 U.S. 138, 147 (1983)).

Plaintiff has not produced evidence sufficient to establish a constitutional violation in regard to his request for overtime

22

work.  This request was a grievance of a purely personal nature.
See Gragg v. Somerset Technical College, 373 F.3d 763, 767 (6th
Cir. 2004)(plaintiff's complaint about the failure to pay her
overtime wages was a purely personal matter, not a matter of public
concern, warranting summary judgment for employer on plaintiff's
First Amendment retaliatory discharge claim).  Since plaintiff's
request for extra work was not protected speech, he does not state
a claim for retaliation even assuming that Webber's motive in
reporting plaintiff's employment with Ohio State was to retaliate
against plaintiff for speaking with her supervisor.

Plaintiff has also failed to prove that Webber's act of
reporting the fact that he worked at Ohio State caused his
termination.  The evidence reveals that defendant was aware of
plaintiff's employment at Ohio State long before plaintiff's
alleged conversation with Webber in March of 2009.  Plaintiff's
termination letter from Ohio State dated January 9, 2009, reveals
that Ohio State was notified by defendant's Labor Relations Office
of plaintiff's continuing employment with the Columbus Public
Schools.  The hearing officer's report of the termination hearing
held on March 16, 2009, states that Adrianne Thomas of defendant's
Human Resources Department also learned that plaintiff was working
at Ohio State and referred the matter to the Office of Labor
Relations for review.  Defendant's Ex. 19.  Thus, the defendant's
Labor Relations Office was aware of plaintiff's employment at Ohio
State long before his alleged conversation with Webber.  There is
no evidence to establish that plaintiff's job would not have been
terminated if Webber had not reported his Ohio State employment.

For the first time in an affidavit filed with his memorandum
contra, plaintiff alleges that his job was terminated "for tensions

23

that arose because I complained about the hurtful comments being made." Plaintiff's complaints of harassment based on national origin were protected speech. Cf. Perry v. McGinnis, 209 F.3d 597, 608-09 (6th Cir. 2000)(complaint of racial discrimination by government employer is protected speech under the First Amendment). However, plaintiff must prove that the fact that he made these complaints caused his termination. Plaintiff's most recent complaint to his supervisors about harassment occurred in May of 2008. His termination was in March of 2009. Thus, there is no temporal proximity between his most recent complaints and his termination which would support an inference of causation. There is also no evidence that Hearing Officer Jerry McAfee, who decided that plaintiff's employment should be terminated, was aware of his prior complaints of harassment. Plaintiff's letters complaining of harassment were addressed and delivered to Greg McCandless and Martha Moore, who were his supervisors at that time. After plaintiff returned from his leave of absence, his supervisor was Debra Webber. There is no evidence that she was aware of his previous complaints.

Based on the evidence presented, no trier of fact could reasonably find that the termination of plaintiff's job was the result of an unconstitutional retaliatory motive. Because no genuine issue of material fact has been shown to exist in that regard, defendant is entitled to summary judgment on plaintiff's claim of retaliation.

F. Hostile work environment

As noted previously, Title VII standards for a hostile work

24

environment are applied to hostile work environment claims brought under §1983. In order to establish a hostile work environment claim, plaintiff must show: (1) that he was a member of a protected class; (2) that he was subjected to unwelcome harassment; (3) the harassment was based on plaintiff's national origin; (4) the harassment unreasonably interfered with plaintiff's work performance by creating an intimidating, hostile, or offensive work environment; and (5) the employer is liable. Barrett v. Whirlpool Co., 556 F.3d 502, 525 (6th Cir. 2009).

To be actionable, harassment must be severe or pervasive, creating an objectively hostile work environment, thus altering the conditions of employment. Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 81 (1998). To satisfy the "unreasonable interference" element, plaintiff must present evidence showing that under the totality of the circumstances, the harassment was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive working environment. Clay v. United Parcel Service, Inc., 501 F.3d 695, 707 (6th Cir. 2007).

The issue of whether a plaintiff suffered a hostile work environment involves both an objective component that asks whether a reasonable person would find the environment hostile and abusive, and a subjective component that asks whether plaintiff subjectively viewed that environment as abusive. Jackson v. Quanex Corp., 191 F.3d 647, 658 (6th Cir. 1999). Factors to consider include the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993). "Simple teasing, ... offhand comments, and

isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). In order to change the terms and conditions of employment, the discriminatory "conduct must be extreme." Id.

The majority of the incidents of "harassment" about which plaintiff complained are too general to support a reasonable inference that the comment or act was motivated by plaintiff's national origin. A few alleged incidents are more specific. In 2006, he complained that one female co-worker told him that he "looked like a Somalian gangster" (although plaintiff is of Iranian ancestry, and is not a Somalian). Defendant's Ex. 23. In 2007, plaintiff informed his supervisor that he had heard "a few co-workers" calling him a "terrorist and other names." The other names were not specified. He also stated that Monica and Tina called him a foreigner and told him he could not wash his bus until they were done washing other buses. In 2008, he informed his supervisors that the co-workers in question were still calling him a "terrorist, gangster and other SOBs." There was also evidence from Brian McCauley that during the period 2005 to 2007, "on several occasions" he heard some employees make remarks like "he is a terrorist, he has got [a] bomb in the bus and going to explode the bus with the kids in it." McCauley Aff., Plaintiff's Ex. 11. Plaintiff's notes indicate that he was informed by McCauley and another co-worker named Jay that a "few people" and "some people in the office" were calling plaintiff a "terrorist." Evidence of comments made outside plaintiff's presence of which he becomes aware during the period of his employment may be considered. Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321, 335 (6th Cir. 2008).

26

The evidence reveals that plaintiff gave five letters to his supervisors from March of 2006 through May of 2008, alleging harassment, mostly in general terms.  Most of the allegations involve merely offensive utterances which did not reference plaintiff's national origin.  The evidence does not reveal how frequent these comments were.  Plaintiff identified three female co-workers in his deposition as being the source of the alleged harassment.  Santino Dep. p. 64.  It is not apparent from the evidence how many other co-workers, if any, made offensive comments, or how often comments were made.  There is no evidence that the harassing comments were constant or pervasive.  Viewing the evidence objectively, a trier of fact could not reasonably find that the alleged comments were sufficiently severe, pervasive or extreme to create an abusive working environment.

Isolated incidents reported over a period of years are not sufficient to establish a pervasive course of conduct, and are not severe enough to create an intimidating, hostile environment that interfered with plaintiff's employment.  See Younis v. Pinnacle Airlines, Inc., 610 F.3d 359, 362 (6th Cir. 2010)(three or four isolated comments by peers over a three-year period insufficient); Bowman v. Shawnee State Univ., 220 F.3d 456, 462-63 (6th Cir. 2000); Burnett v. Tyco Corp., 203 F.3d 980, 984-85 (6th Cir. 2000)(three offensive incidents within a six-month period not sufficient).

Plaintiff reported two instances which he felt amounted to threats of physical assault.  On one occasion, Plaintiff reported in the May 9, 2007, letter to his supervisors that Monica and Tina, two female co-workers who were washing buses, became upset with him when he wanted to wash his bus first and "almost hit me."  However,

27

the letter contains no description of what physical actions on their part lead him to believe that the women intended to physically assault him.  On September 19, 2007, plaintiff recorded in his journal that the previous year, a mechanic named "Robin" raised a crowbar when plaintiff reported trouble with his bus, but Robin then said he was only joking.  The evidence suggests that this mechanic simply liked to give drivers who brought him work a hard time.  There is no evidence that plaintiff was ever physically attacked or injured.

There is evidence that plaintiff, who, according to Dr. Smalldon's report, demonstrated a "strongly paranoid flavor of personality style/orientation[,]" subjectively viewed the conduct of his co-workers as harassment.  That evidence consists of the letters he wrote to his supervisors complaining about the harassment, his journal notes, and comments he made to his brother, Dr. Moomchi, and other friends.  However, statements made by plaintiff in his resignation letters rebut this evidence.  In his letter of September 12, 2008, plaintiff stated that he "truly enjoyed working with all of my co-employees[.]"  In his resignation letter dated January 9, 2009, plaintiff stated that he was "writing this letter with a deep pain, because in working with Columbus Schools, I found there are truly plenty of great people with lots of common-sense, compassion in which you can count on."  In his letter dated January 16, 2009, rescinding his resignation letter of January 9, 2009, plaintiff stated, "I love working with Columbus City Schools, people I serve and work [with]," and that it was "difficult to leave City Schools[.]"

There is no evidence that the alleged harassment unreasonably interfered with plaintiff's work performance.  The record of

28

plaintiff's termination hearing includes letters from parents praising his performance as a bus driver. The record reveals that he received a letter of commendation for having a perfect attendance record for the school year 2007-2008. There is no evidence that his work environment had significantly deteriorated after the 2008 summer break. When plaintiff saw Dr. Slayman on September 3, 2008, he complained of fatigue and insomnia, and stated he had "a little stress." Defendant's Ex. 26. Dr. Slayman's records contain no complaint by plaintiff about harassment in his place of work. Dr. Slayman felt that plaintiff should not be driving a bus with his reported symptoms, which was why Dr. Slayman gave plaintiff a three-week work excuse. Slayman Dep. p. 13, 16. After that visit, plaintiff sought additional extensions for leave. At that point, plaintiff was receiving sick leave pay as well as a salary from driving a bus at Ohio State. Although plaintiff reported being very depressed when he saw Nurse Ambrose on September 24, 2008, he told her it was because he had lost his girlfriend. Defendant's Ex. 28. On December 1, 2008, his next visit, plaintiff denied being depressed and stated he was ready to go back to work. Defendant's Ex. 30.

Considering the totality of the evidence, no trier of fact could reasonably conclude that the alleged harassment and offhand comments identified in the evidence were so severe or pervasive as to alter the conditions of plaintiff's employment or to create an abusive working environment. Defendant is entitled to summary judgment on this claim.

## G. Municipal liability under Monell

Defendant argues that it is also entitled to summary judgment

on plaintiff's §1983 claims because plaintiff has failed to produce evidence that the defendant engaged in a custom or policy of discrimination. "While §1983 permits suits against municipalities for Equal Protection claims, 'a local government may not be sued under §1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom ... inflicts the injury that the government as an entity is responsible under §1983.'" Arendale, 519 F.3d at 599 (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978)). Plaintiff cannot base his claims against the defendant solely on the conduct of individual employees because respondeat superior is not available as a theory of recovery under §1983. Vereecke v. Huron Valley School District, 609 F.3d 392, 403 (6th Cir. 2010). Plaintiff must show that the school district itself is the wrongdoer. Doe v. Claiborne County, Tenn., 103 F.3d 495, 507 (6th Cir. 1996).

To hold defendant liable, plaintiff must: (1) identify the municipal policy or custom; (2) connect the policy to the municipality; and (3) show that his particular injury was incurred due to the execution of that policy. Turner v. City of Taylor, 412 F.3d 629, 639 (6th Cir. 2005). The defendant cannot be found liable unless the plaintiff can establish that an officially executed policy, or the toleration of a custom within the school district lead to, caused, or resulted in the deprivation of a constitutionally protected right. Claiborne County, 103 F.3d at 507. A "custom" must "be so permanent and well settled as to constitute a custom or usage with the force of law." Monell, 436 U.S. at 691. It must reflect a course of action deliberately chosen from among various alternatives. City of Oklahoma City v.

Tuttle, 471 U.S. 808, 823 (1985).

Plaintiff has produced no evidence that defendant had a custom or policy of terminating employment for impermissible reasons such as the national origin of the employee. Plaintiff has also produced no evidence that defendant had a custom or policy of retaliating against its employees for engaging in speech protected under the First Amendment.

Plaintiff does claim that Greg McCandless, his supervisor, did not always act in response to his complaints of harassment. To prove liability under a theory of inaction, plaintiff must show: (1) the existence of a clear and persistent pattern of discrimination by school employees; (2) notice or constructive notice on the part of the defendant; (3) the defendant's tacit approval of the unconstitutional conduct, such that its deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the defendant's custom was the "moving force" or direct causal link in the constitutional deprivation. City of Canton, Ohio v. Harris, 489 U.S. 378, 388-389 (1989). "'Deliberate indifference' in this context does not mean a collection of sloppy, or even reckless, oversights; it means evidence showing an obvious, deliberate indifference to [discrimination]." Claiborne County, 103 F.3d at 508. "There is an analytical distinction between being deliberately indifferent as to one particular incident, and having a 'policy' of always being deliberately indifferent to unconstitutional actions." Id. Rather, the record must show that the defendant "consciously never acted when confronted with its employees' egregious and obviously unconstitutional conduct." Id.; see also Arendale, 519 F.3d at 600.

31

The evidence in this case does not suffice to establish a custom or policy of inaction in the face of unconstitutional conduct.  Plaintiff produced no evidence that any other employee was harassed on the basis of national origin, race or other impermissible factor.  Thus, there is no clear or persistent pattern of discrimination by school employees.  See Swanson v. Livinston County, 121 Fed.Appx. 80, 85 (6th Cir. 2005)(county entitled to summary judgment based on failure to prove custom or policy where plaintiff failed to identify alleged harassment against any individual but herself).  The evidence is also insufficient to show that defendant was deliberately indifferent to the alleged acts of discrimination reported by plaintiff or by others.  Even plaintiff acknowledged in his deposition that Martha Moore, his immediate supervisor, did respond to his complaints by stating on at least two occasions that she would speak with the employees who were allegedly harassing plaintiff.  Santino Dep. pp. 66, 73; Journal Note April 3, 2007 (Martha Moore called plaintiff into her office and stated, "I am going to talk to those [people] calling you [a] terrorist and other thing[s] ... like [foreigner].").  On one occasion, plaintiff observed her speak with his three female co-workers.

Since no trier of fact could reasonably find from the evidence that defendant had a custom or policy of permitting its employees to engage in disparate treatment, retaliation or harassment on the basis of national origin, or of failing to address or control such discriminatory practices engaged in by its employees, no grounds have been shown for the imposition of §1983 liability on the defendant.

H. Intentional infliction of emotional distress

Plaintiff has also alleged that the defendant's actions or failure to act constituted the intentional infliction of emotional distress. To the extent that plaintiff's complaint may be read as asserting a claim of intentional infliction of emotional distress against defendant under Ohio law, defendant argues that it is entitled to summary judgment on this claim.

Defendant first argues that it is entitled to immunity from suit on this claim under Ohio Rev. Code §2744.02(A)(1), which provides that political subdivisions are not liable in damages. For purposes of that section, public school districts are classified as political subdivisions. Ohio Rev. Code §2744.01(F). Hubbard v. Canton City School Bd. of Educ., 97 Ohio St.3d 451, 453, 780 N.E.2d 543 (2002); Price v. Austintown Local School Dist. Bd. of Educ., 178 Ohio App.3d 256, 260, 897 N.E.2d 700 (2008). In addition, there are no exceptions to immunity under §2744.02(A)(1) for the intentional tort of intentional infliction of emotional distress. Wilson v. Stark County Dep't of Human Services, 70 Ohio St.3d 450, 452, 639 N.E.2d 105 (1994); Price, 178 Ohio App.3d at 262 (political subdivisions are immune from liability from intentional tort claims).

Ohio Rev. Code §2744.09 provides that the immunity granted under Chapter 2744 does not apply to civil actions by an employee against his political subdivision relative to any matter that arises out of the employment relationship between the employee and the political subdivision. Ohio Rev. Code §2744.09(B). One Ohio appellate court has interpreted this section as meaning that the immunity provided under Chapter 2744 does not bar an employee's tort claim for intentional infliction of emotional distress which

33

arises out of the employment relationship. See Sampson v. Cuyahoga Metropolitan Housing Authority, 188 Ohio App.3d 250, 256, 935 N.E.2d 98 (2010). However, the Ohio Supreme Court has granted leave to appeal in that case. 127 Ohio St.3d 1460 (2010). In addition, a substantial number of other Ohio courts have addressed the issue of whether an employer intentional tort is excepted under §2744.09(B) from the statutory grant of immunity to political subdivisions and have decided that it is not. See Terry v. Ottawa County Bd. of Mental Retardation & Developmental Disabilities, 151 Ohio App.3d 234, 240-241, 783 N.E.2d 959 (2002)(citing cases). Therefore, in accordance with the majority of Ohio courts, this court concludes that any claim of intentional infliction of emotional distress asserted by plaintiff against defendant is barred by the immunity afforded political subdivisions under Chapter 2744.

Defendant also argues that the evidence is insufficient to show the existence of a genuine issue of material fact on this claim. In a case for intentional infliction of emotional distress, a plaintiff must prove: (1) that the defendant intended to cause the plaintiff serious emotional distress; (2) that the defendant's conduct was extreme and outrageous; and (3) that the defendant's conduct was the proximate cause of plaintiff's serious emotional distress. Phung v. Waste Management, Inc., 71 Ohio St.3d 408, 410, 644 N.E.2d 286 (1994).

A defendant is liable for intentional infliction of emotional distress if his "extreme and outrageous conduct intentionally or recklessly causes serious emotional distress to another." Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of America, 6 Ohio St.3d 369, syllabus, 453 N.E.2d 666 (1983),

34

abrogated on other grounds, Welling v. Weinfeld, 113 Ohio St.3d 464, 866 N.E.2d 1051 (2007). Liability has been found only where the defendant's conduct has been so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Id. at 374-75.

There is no evidence in this case from which a trier of fact could reasonably find that defendant intended to cause plaintiff serious emotional distress. There is also no evidence to support a finding that defendant engaged in extreme or outrageous conduct. A trier of fact could not reasonably find, based on the evidence in this case, that the defendant intentionally discriminated or retaliated against plaintiff, or treated him differently based on his national origin in terminating his employment. There is also no evidence that defendant had a policy of deliberately encouraging a hostile working environment or ignored complaints of discrimination.

In addition, there is insufficient evidence to show that plaintiff suffered serious emotional distress. "Serious emotional distress" goes beyond merely trifling disturbance, mere upset, or hurt feelings. Paugh v. Hanks, 6 Ohio St.3d 72, 78, 451 N.E.2d 759 (1983). The emotional injury must be so severe and debilitating that "a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." Id. Serious emotional distress includes traumatically induced neurosis, psychosis, chronic depression, and phobia. Id. A plaintiff claiming serious emotional distress must present some "guarantee of genuineness" in support of his claim to prevent summary judgment in favor of the

defendant.  <u>Ford Motor Credit Co. v. Ryan</u>, 189 Ohio App.3d 560, 590, 939 N.E.2d 891 (2010).  Such guarantee may be supplied with expert medical testimony or the testimony of lay witnesses who testify as to any marked changes in the emotional or habitual makeup that they discern in the plaintiff.  <u>Id.</u>

There is some evidence that plaintiff was upset and under stress, allegedly due to the name calling and other slurs or jokes based on plaintiff's national origin.  However, there is no evidence that this stress was severe or debilitating, or that it interfered with his employment or other activities.  Plaintiff did not consult with a psychiatrist, psychologist or other mental health professional until his June 8, 2011, appointment with Metamorphosis Counseling and Consulting.  The fact that plaintiff requested that Mr. Peterson prepare a report concerning his consultation with the plaintiff suggests that this visit was for the purpose of securing additional evidence for use in this action.  However, even if this report is considered, it does not establish that plaintiff was suffering from serious emotional distress while he was employed by the defendant.  Plaintiff complained twice about stress in his visits to Dr. Slayman's office in September of 2008, but during the December 1, 2008, visit, he denied having any high level of stress, sleep disturbances, anxiety attacks or worrying, and stated that he was feeling much better and was ready to go back to work.

Because plaintiff's claim of intentional infliction of emotional distress is barred by Chapter 2744 immunity, and because plaintiff has not produced evidence sufficient to raise a genuine issue of material fact in regard to this claim, defendant is entitled to summary judgment on this claim.

III. Conclusion

In accordance with the foregoing, defendant's motion for summary judgment (Doc. No. 41) is granted.  The clerk shall enter final judgment in favor of defendant Columbus Public Schools and against plaintiff Nick A. Santino on all of plaintiff's claims.


Date: June 24, 2010                    _____s/James L. Graham_____
                                       James L. Graham
                                       United States District Judge